Puritan Church-The Church of America v. Commissioner. Puritan Church Building Fund, Anita P. Bird and Edith S. Parker, Trustees v. Commissioner.
Puritan Church-The Church of America v. Commissioner
Docket Nos. 23814, 25701.
United States Tax Court
1951 Tax Ct. Memo LEXIS 226; 10 T.C.M. (CCH) 485; T.C.M. (RIA) 51151; May 22, 1951
David Rein, Esq., 711 Fourteenth Street, N.W., Washington 5, D.C., for the petitioners. William *227 A. Schwerdtfeger, Esq., for the respondent. JOHNSON
Memorandum Findings of Fact and Opinion JOHNSON, Judge: In these consolidated proceedings respondent has determined deficiencies in income tax, fraud penalties and delinquency penalties against the petitioner in Docket No. 23814, Puritan Church-The Church of America, as follows: Year
Deficiency
25% Penalty
50% Penalty
Fiscal period Oct, 14, 1945, to Dec. 31 - 1945
$ 1,709.00
$ 427.25
$ 854.50
1946
17,417.18
4,354.29
8,708.59
1947
76,571.05
19,142.76
38,285.52
Respondent has further determined liability as transferee of the assets of petitioner Puritan Church-The Church of America in the same amounts against the petitioner in Docket No. 25701, Puritan Church Building Fund, for the same years. The Puritan Church-The Church of America will hereinafter be referred to as petitioner. Respondent in his brief concedes that for the year 1947 petitioner's net income should be reduced in the amount of $29,900 from that set out in the deficiency notice. Respondent, under the provisions of section 146(a), Internal Revenue Code, has determined in the *228 90-day notice to the Puritan Church Building Fund income tax liability against petitioner for the taxable period January 1, 1948, to June 30, 1948, in the amount of $136,455.72. This liability, however, is not in issue here. The issues are: (1) Whether petitioner is exempt from income tax within the provisions of section 101(6) of the Internal Revenue Code during the respective years involved? (2) Whether petitioner during the periods involved received income within the meaning of the Internal Revenue Code? (3) Whether respondent properly determined petitioner's taxable net income for the periods here involved? (4) Whether petitioner is liable for the penalty for failure to make and file returns in compliance with section 291(a) of the Code? (5) Whether all or any part of the deficiencies in tax for the years 1945, 1946 and 1947 is due to fraud with intent to evade tax within the meaning of section 293(b) of the Code? (6) Whether the Puritan Church Building Fund is a transferee of petitioner? If so, to what extent is it liable for any taxes, penalties or interest owed by the petitioner? Findings of Fact Petitioner is a corporation organized *229 under the laws of the State of Illinois whose principal office during the periods here involved was at La Grange, Illinois. Petitioner filed no exemption affidavit on the form prescribed by respondent until April 18, 1950, after the pleadings had been filed in these proceedings, claiming exemption from the payment of income tax for the reason that it was a religious organization, nor has it ever filed Federal income tax returns. Petitioner was formed by Harrison Parker October 14, 1945, as a result of a merger of three organizations: The Puritan Church, The Puritan Church of the United States, and The Puritan Church-The Church of America. It was incorporated under the laws of Illinois on January 4, 1946. Parker assumed the title of Chancellor early in the organization period and was also a trustee. Upon his resignation as trustee, Edith S. Parker, his wife, became a trustee. Anita P. Bird, sister of Parker, has been a trustee of petitioner since early in its operation. Viggo E. Bird, husband of Anita P. Bird, has held various positions at different times. Petitioner's activities have largely been directed by Parker from its inception. Parker, during his early life, was engaged *230 in the newspaper business. In 1917, which is the last time he was employed on a salary, he left the newspaper business and became interested in various financial and stock promotion ventures. These activities continued until about 1932. In 1934 Parker brought a libel action for $1,500,000 against the Chicago Tribune Company. Three years later when the action was brought to trial the jury returned a verdict for the Chicago Tribune. Also during the period of 1934 through 1940 Parker was engaged in a series of legal actions seeking to compel the Chicago Tribune to pay the State of Illinois large amounts of past due personal property and capital stock taxes which he claimed it owed. One of these legal actions consisted of an action brought in 1935 before the Board of Appeals of Cook County seeking an assessment of a capital stock tax against the Chicago Tribune Company which was dismissed. Founded on remarks made about Parker during these proceedings by the attorney for the Tribune Company, Parker instituted an action of slander against the attorney in the Superior Court of Cook County. This action was dismissed for insufficiency of the amended complaint and affirmed on appeal. Parker v. Kirkland (1939), 298 Ill. App. 340. *231 Parker thereafter brought three actions in mandamus in the Circuit Court of Cook County to compel the local taxing officials to institute action against the Tribune Company. The first action was dismissed by the Circuit Court and affirmed on appeal to the Supreme Court of Illinois, The People ex rel. Harrison Parker v. The Board of Appeals of Cook County, et al. (1937), 367 Ill. 559, as was the second action in mandamus. The People ex rel. Harrison Parker v. Emmett J. Whealan, et al. (1938), 370 Ill. 243. The third action was withdrawn by Parker in 1940 after hearings had been held for over a year. In 1941 Parker wrote two letters couched in inflammatory language to the Cook County grand jury accusing the Chicago Tribune Company and public officials of being engaged in a criminal conspiracy to defraud the State of Illinois of revenue. As a result of this, Parker was found guilty of contempt of court and was sentenced to serve a term of ten days in the Cook County jail. This conviction was sustained on appeal to the Supreme Court of Illinois. People v. Parker (1940), 374 Ill. 524. He served his sentence in the early part of 1941. On May 4, 1941, Parker *232 wrote the following letter: "City Editor, Chicago Tribune "Dear Sir: "I possess and will turn over to you, evidence of the 'fix' of another of Courtneys assistants in Circuit Court case 35C14379 in which the tax stealing 'Ring', led by the crooked Chicago Tribune, got away with a sum of state money, in the approximate sum of 100 million dollars. "I have been in the county jail for 10 days for writing a letter to the Cook County Grand Jury, that the evidence of the 'fix' was extant and available. "Under the law of Illinois, religious organizations have the right, to publish newspapers. I have interested a religious organization, to publish a newspaper to compel the Cook County Grand Jury to indict in the 100 million dollar tax scandals. I will sit on the side lines and enjoy the spectacle of the persons involved in this tax scandal, attempting to put in the County Jail, the editor of a religious newspaper who will be 'hollering' to the Grand Jury, about the 'tax stealing ring' led by the Chicago Tribune. "I had in the County Jail, a nice rest and an opportunity to think, while I rested. Stock can be sold in a newspaper owned by a religious organization. I think the idea *233 of a newspaper like the Day Book to be published in Chicago by a religious organization, is a good one. I like the idea. It intrigues my 'fine Italian brain', as Mr. Carvalho of the Hearst organization, used to call it. I am going to put on the tail of Robert R. McCormick and the crooked Tribune law firm, a religious organization and its newspaper. I am "Very truly yours, [Signed] "Harrison Parker "May 4, 1941 "P. S. Hitler was in jail; so was Mussolini; so were other 'fighters', like me." In 1932 Parker met Dr. Agnes Richardson who professed an interest in theology and humanitarian ventures and who had formed an organization called The Tri-Liberation League of America. She associated with Parker to continue her ventures and had an office at 11 South La Grange Road, La Grange, Illinois, the address of other organizations subsequently formed. Parker formed various organizations with religious titles during the period beginning in 1941 or 1942 to the date petitioner was formed in 1945. The "Brotherhood of the Ancient Order of St. John" was created by Parker in 1941 or early 1942 with offices at La Grange, Illinois. Under the name of this organization Parker had printed a *234 publication entitled "The National Issue" dated March 20, 1942, attacking the Chicago Tribune, Colonel Robert R. McCormick and other individuals on the tax issue and for the incarceration of Parker for contempt of court. This publication supported Parker for election to the position of Cook County Tax Assessor in the April, 1942, Republican primary. Contributions were solicited for the campaign and were to be mailed to "The Chancellor of The Brotherhood of the Ancient Order of St. John, La Grange, Illinois." On December 23, 1940, "The Puritan Church" was formed. It was incorporated January 2, 1942. Parker was designated as its "Ecumenical Patriarch". From 1942 through 1944, Parker wrote letters to the Chicago Tribune, McCormick and others, as well as the Cook County grand jury continuing his attack on the tax issue and representing that the Puritan Church had the necessary evidence and would bring the Chicago Tribune to task. Parker formed another organization called "The Puritan Church of the United States of America" by filing an Affidavit of Incorporation with the Recorder of Deeds of Cook County, Illinois, on June 28, 1943. Parker assumed the title of secretary of this organization. *235 The next organization which Parker formed was "The Mother and Father Church of the Puritan Church, of La Grange, Illinois", which was incorporated September 2, 1943. Dr. Agnes Richardson was named "Chancellor" at the suggestion of J. L. Stewart of the J. L. Stewart Agency, and although she was appointed "Chancellor" she was not acquainted with the individuals Parker had named as trustees. She performed no duties of an administrative nature nor did she receive any mail or contributions addressed to the "Chancellor". She attended no meetings nor does she know of any meetings of the congregations of any of these various organizations having been held. Her association with Parker was terminated in 1947. Petitioner was the next organization formed. It came into being October 14, 1945, and was incorporated January 4, 1946, as pointed out above. The object of the organization as stated in the by-laws adopted August 17, 1947, is as follows: "This organization was founded as a means of disseminating through the U.S. Mails and otherwise, the revelations of God vouchsafed to its members, on religious, educational, political, benevolent, fraternal, charitable and reformatory subjects, the *236 study of which will cause in the individuals who practice them, a mental development along scientific lines. "In addition to promoting the above idea, the objects of this society, are to promote unqualified allegiance to the general government, protect the rights and liberties of American citizenship, and maintain national honor, union, and independence." Parker, as early as December 5, 1944, under the title of "Chancellor" of the Puritan Church-The Church of America, in a letter to the Cook County grand jury, stated in part: "Foreman Cook County Grand Jury Criminal Court House Chicago, Illinois. "This Church has in its possession, in writing, under oath, evidence of a criminal conspiracy between certain politically powerful interests and certain elected tax officials of Cook County, existing in Cook County, State of Illinois. There was an overt act in the criminal conspiracy during the past eighteen months. * * *
"The men who had the courage to gather this evidence have been jailed, attempts have been made to murder them, and illegal attempts have been made to 'railroad' them to an insane asylum. "These outraged persons were defenseless against the machinations of *237 the millionaire interests who have possession of the enormous sum of money stolen by the criminal conspiracy. But, this Church has undertaken the defense of these outraged persons and the restoration to the looted Treasury of Cook County, of all the stolen money." Another letter, mailed to the City Editor, Chicago Tribune, on stationery of petitioner, postmarked January 29, 1945, stated in part: "This Church is dedicated to make the crooked Chicago Tribune to disgorge every cent of the stolen money. "Very Truly Yours "The Puritan Church by Harrison Parker Its Chancellor" And continuing in the same letter: "If Harrison Parker can be put in jail 'for contempt of court,' the Puritan Church will gain, 1000 members each day he is in the jail. And, if he do not go to jail, the Puritan Church will gain at least 180,000 members; * * *." Again in a letter to the City Editor of the Chicago Tribune postmarked January 31, 1945, Parker wrote in part: "This Church is circulating a petitioner to put a Non Partisan Ticket, to oppose the Coalition ticket in the June next, Judicial election; then the tax stealing of the Chicago Tribune and the antics of this McCormick, will be given *238 due publicity. "The Puritan Church by Harrison Parker, its Chancellor." Throughout 1946, 1947 and 1948 Parker as Chancellor of petitioner continued writing letters to the Chicago Tribune and others in a similar tenor as those above, asserting the intentions of the petitioner, signing them in his name under the title of "Chancellor" of the Puritan Church or merely as "Its Chancellor". During the course of Parker's litigation with the Chicago Tribune Company, Jacob Shamberg, assistant state's attorney, made uncomplimentary remarks about Parker. On December 8, 1943, Parker brought an action against Shamberg for slander. That case was never heard on its merits. However, during its pendency, Parker refused to comply with an order to produce certain documents and, instead filed an affidavit on January 4, 1945, attaching various documents purporting to be documents of the Puritan Church. As a consequence of such action, the Circuit Court of Cook County found Parker guilty of contempt in two separate judgment orders and sentenced him to 90 days in jail on each. Upon appeal to the Appellate Court of Illinois, the judgment order of direct criminal contempt was reversed. The judgment order *239 of direct contempt was affirmed. People v. Parker (1946), 328 Ill. App. 46. This decision was affirmed when appealed to the Supreme Court of Illinois, People v. Parker (1947), 396 Ill. 583; rehearing denied, and when appealed to the Supreme Court of the United States it was also affirmed. Parker v. Illinois (1948), 333 U.S. 571; rehearing denied, 334 U.S. 813. A letter from petitioner signed by "Harrison Parker, Its Chancellor" to the foreman of the Cook County grand jury dated May 9, 1946, charging that the Tribune Company had evaded taxes resulted in contempt proceedings being instituted against Parker in the Criminal Court of Cook County. He was found guilty of criminal contempt and sentenced to serve six months in the Cook County jail. This conviction was affirmed upon appeal to the Supreme Court of Illinois and the Supreme Court of the United States. People v. Parker (1947), 397 Ill. 305; rehearing denied, 334 U.S. 816. Parker began serving these two jail sentences in October, 1948. While confined in the Cook County jail, he wrote and had published a pamphlet dated December 8, 1948, addressed to *240 the House of Representatives of the United States attacking the United States Supreme Court and seeking impeachment of five of its justices. It was largely a repetition of the previous publications and letters of the Puritan Church and its Chancellor attacking the Chicago Tribune on the tax issue. Some time prior to the formation of petitioner Parker became acquainted with J. L. Stewart of the J. L. Stewart Agency. Through this agency petitioner inserted advertisements in various newspapers and publications throughout the country seeking subscriptions to petitioner's various publications. Petitioner also purchased lists of names and addresses of individuals to whom advertisements could be mailed. One of the first publications advertised by petitioner and distributed through the mails was entitled "God's Power in Human Affairs". Its published price was five dollars. On the cover it was stated: "The method by the use of which one person raised his own salary of $35.00 a week, as a stenographer, to $2000.00 a week as an executive; another raised his own salary of $18.00 a week as a counter clerk, to $75,000.00 a year, as a sales manager." It also contained a solicitation for subscriptions *241 for the set of 12 lessons published by petitioner and the statement that in the event the lessons are not found to be worth the amount "donated", the money would be refunded upon return of the lessons. The 12 lessons were copyrighted during 1946 and 1947. They were written by Parker and distributed by petitioner. Each lesson was sold for $2 each, or $19.75 for the series of 12. In some cases a lesser amount was paid. Petitioner received about $6,000 per month from the sale of these lessons. Petitioner published and sold, through the mail, another booklet called "Divine Healing as Practiced by Jesus of Nazareth", at the price of $1. An advertisement concerning this booklet told of the announcement by the Puritans of the discovery of a "mysterious element" which remains unexplained in the booklet. Financial gains achieved by various individuals through the use of this "mysterious element" are claimed. Various form letters used to answer letters of inquiry concerning the lessons were composed by Parker for petitioner. Parker personally answered some inquiries concerning personal problems. Petitioner carried on all of its activities by way of the mails. It kept no membership roll *242 book, had no meeting hall nor auditorium and held no church services nor religious meetings. On July 24, 1947, petitioner in a letter signed by "Its Chancellor" informed the campaign manager for the Progressive party that it was believed petitioner could "raise $200,000 for a campaign fund to defeat the Chicago Tribune's Coalition ticket". Petitioner entered into a contract with J. L. Stewart Agency on August 8, 1947, as follows: "MEMORANDUM OF AGREEMENT "In consideration of $1.00, receipt of which is hereby acknowledged, and other valuable considerations, it is understood and agreed "(First) That the Puritan Church, the Church of America, located at La Grange, Illinois, will conduct a contest or contests for the purpose of raising enough money to erect church buildings at La Grange, Illinois and elsewhere. "(Second) The J. L. Stewart Agency at Chicago, Illinois agrees to plan such contests, write all literature, handle all advertising, arrange for printing etc. paying for same out of cash furnished by the Puritan Church. Also to assist in arranging for judges to determine the winners. "(Third) The Puritan Church agrees to advance $40,000 in cash to the J. L. Stewart *243 Agency for the purpose of paying for advertising, literature and other items purchased for the benefit of the first Puritan Church contest and advance to the J. L. Stewart Agency such other cash monies as may be necessary to promote the first and subsequent contests. "(Fourth) And for the service rendered by the J. L. Stewart Agency, the Puritan Church agrees to pay the J. L. Stewart Agency a sum equal to 26 2/3% of the gross amount taken in as a result of the first contest, less their cost of handling, in other words 26 2/3% of the receipts less the expenses. "(Fifth) The Puritan Church agrees to pay J. L. Stewart Agency a sum equal to 33 1/3% on all such contests after the first contest. "(Sixth) The Puritan Church agrees to pay to the J. L. Stewart Agency on the 15th of each month all monies due them out of such excess, such payments to begin on or before November 15th, 1947. "(Seventh) This agreement to expire five years from this date unless renewed by mutual consent. "Signed and dated at Chicago, Illinois this 8th day of August, 1947. "Puritan Church, the Church of America
(By) [Signed] Harrison Parker, Its Chancellor "J. L. Stewart Agency (By) [Signed] *244 J. L. Stewart "[Signed] C. C. Waterbury Witness" At about the same time, petitioner, in its publications and in its letters written in answer to inquiries, repeatedly asserted: "The Puritans have outgrown their church edifices; Their temples are in the homes; their cathedrals are in the skies; their altars are in the hearts of men everywhere." The asserted purpose of the puzzle contest was to raise funds to build a "Meeting House" at La Grange, Illinois. Petitioner owned no real estate at this time. The first contest was started September 6, 1947, and was to end February 28, 1948. The solution of the puzzle was to be accompanied by varying sums of money: $3, $6, $9, $12. The amount of the grand prize was dependent upon the amount of money accompanying the puzzle solution. Few responses were received. Other contests of the same type were then started. Two of these were for prizes of $250. These required no initial entry fee. The first was to terminate November 15, 1947, and the other February 21, 1948. Over 50 per cent of the entries submitted by contestants throughout the country were graded as correct. Upon receipt of the solutions to these puzzles, letters were written *245 by petitioner to the contestants announcing the puzzle with the grand prize of $3,500 and urging them to submit their entries together with a "donation". The letters written by petitioner to the contestants submitting correct answers were similar to letters written to contestants whose answers were incorrect. Letters were sent to contestants who entered the $3,500 contest, but had paid less than $12, urging them to send an additional amount, which, together with the initial fee, would total $12, in order to entitle them to the top prize. Tie breaker puzzles were sent to those contestants of the first $250 contest who submitted correct answers. No money was requested to be sent with the answer to these puzzles. The solutions to the $3,500 contest were graded as to correctness by petitioner's clerks and the amount of money received with the entry was indicated on the answer form. Following this, the answers were tied in bundles and placed in boxes for storage. No record was kept aside from this as to the names of the participants or the specific amount of money paid by each contestant. No judges were selected to determine the winner. The Post Office Department, in response to complaints *246 received concerning the contest, initiated an investigation prior to December 16, 1947. The mail was stopped by agreement on February 23, 1948. On April 6, 1948, the Post Office Department, after a hearing, found that Parker as Chancellor of petitioner had used the mails for fraudulent purposes and entered an order denying the use of the mails to petitioner. Petitioner then brought an action in the District Court for the Northern District of Illinois seeking an injunction against the postmaster at La Grange, Illinois, who had acted in accordance with the above order. Upon motion by the postmaster for summary judgment which was granted, the petitioner's complaint was dismissed on July 16, 1948. On April 9, 1948, a suit in equity was filed against Parker and petitioner in the Circuit Court of Cook County. Clifton M. Kimbrough, et al. v. Harrison Parker, The Puritan Church-The Church of America and Jesse L. Stewart. On November 4, 1949, a decree was entered finding that defendants had, by fraudulent representations, obtained from plaintiffs and others a sum in excess of $230,574.26, and that defendants were liable to each contestant in the puzzle contest in the respective amounts *247 contributed by each. On appeal, the Supreme Court of Illinois concluded it did not have jurisdiction and transferred the cause to the Appellate Court for the First District. 407 Ill. 274. On February 18, 1949, an indictment was filed in the United States District Court for the Northern District of Illinois in the case of United States v. Harrison Parker, et al., No. 49CR89, charging Parker, his wife Edith, Anita P. Bird, Jesse L. Stewart and C. C. Waterbury with using the mails to defraud in connection with the puzzle contest. This action is still pending. Petitioner maintained a bank account at the Montague State Bank, formerly known as the Farmers State Bank, located at Montague, Michigan, about 175 miles from La Grange, Illinois. This account was opened on November 8, 1945, with an initial deposit of $1,000. Authorized signatures to draw on this account were "Harrison Parker" and "Anita Bird." On May 23, 1946, the additional signatures of "V. E. Bird" and "Ferne Carter" were authorized. On August 17, 1947, the signature authorization was amended to include only "Harrison Parker", "Anita Bird", and "Edith S. Parker". In 1945, $6,700 was deposited in petitioner's *248 account. During 1946 there was deposited in petitioner's account $47,023.60, during 1947, $161,949.01, and during the period January 1, to June 30, 1948, $359,094.03. Respondent determined that these amounts constituted income to petitioner. Anita P. Bird and Viggo E. Bird drew checks on their account at the Central Hanover Bank and Trust Co., New York; the La Grange National Bank, La Grange, Illinois, and the Bank of Montreal, payable to petitioner during the years 1945, 1946 and 1947 in the amounts of $4,500, $27,948.53 and $5,500, respectively, or a total of $37,948.53. These amounts did not constitute income to petitioner. Relative to the above money given to petitioner by the Birds, Parker testified at the hearing before the Post Office Department in March, 1948, as follows: "Question: Well, this sum that your sister advanced it was a loan, was it not? "Answer: No, of this $53,000 she borrowed on her personal note at the Hanover National Bank in New York City, $16,000 which she turned over to the Church. She borrowed it personally and turned it over to the Church. "Question: Was there any agreement regarding the repayment of this $16,000? "Answer: There was. There *249 was an agreement that the church would pay back the $16,000. "Question: Was it repaid? "Answer: It was. "Question: Before this contest started? "Answer: Yes. "Question: The remainder was a contribution, was it not? "Answer: Yes. On December 10, 1947, petitioner opened another account with this bank called "Puritan Church Building Fund". Signatures authorized to draw on this account were "Anita Bird" and "Edith S. Parker". Four deposits totaling $6,495.29 were made to this account during December, 1947. On February 26, 1948, petitioner transferred $150,000 to this account from its regular account. This special account was closed out April 12, 1948, when two bank money orders were issued to "Anita Bird and Edith S. Parker, Trustees of Puritan Church-The Church of America". One was in the amount of $6,495.29 and the other in the amount of $150,000. Both of these money orders were exchanged on May 13, 1948, for money orders made out in the same amounts payable to the "Puritan Church Building Fund, Anita Bird and Edith S. Parker, Trustees". The latter money orders were then endorsed "For deposit in the Greenwich Trust Co. Puritan Church Building Fund" and deposited therein *250 on June 7, 1948. On May 13, 1948, when the money orders were made out payable to the Puritan Church Building Fund, petitioner had assets consisting of some office furniture and $254.81 in its bank account. The proceeds received by petitioner from the sale of its pamphlets and the puzzle contest were not all deposited in its bank account. Petitioner also dealt with various currency exchanges, one of which was located in LaGrange and two others located in Chicago, where cash in small denominations was exchanged for currency of larger denominations. Money orders were also purchased from these currency exchanges. During 1947 petitioner, through Parker, purchased six money orders payable to Parker, eleven to Anita P. Bird and three to Edith S. Parker in the aggregate amounts of $891.65, $1,740.65 and $436.17, respectively. In 1948 three such money orders were purchased payable to Anita P. Bird in the total amount of $1,925 and two payable to Edith S. Parker in the amount of $1,100. Some of the money orders made payable to Anita P. Bird were deposited in her personal account at the Greenwich Trust Company, Greenwich, Connecticut, while others were deposited in her account at the Central *251 Hanover Bank and Trust Company in New York. Three of the money orders made payable to Parker were endorsed to Edith S. Parker and cashed in Los Angeles. During March, 1948, in anticipation of the issuance of the fraud order by the Post Office Department, petitioner began withdrawing its funds from the Montague State Bank. On March 11, 1948, two money orders, each in the amount of $15,000, were purchased. These were made payable to petitioner and petitioner's bank account was debited in the amount of $30,000. Parker endorsed one of these, in the name of petitioner, to Anita P. Bird, who in turn, deposited it in her personal account in the Greenwich Trust Company. The other was held by Parker until June 28, 1948. On March 31, 1948, a money order in the amount of $10,000 was purchased with petitioner's funds and made payable to petitioner. On June 22, 1948, another money order was purchased and made payable to petitioner in the amount of $5,000. This amount was not withdrawn from petitioner's account. The two latter money orders together with the one in the amount of $15,000 issued March 11, 1948, were endorsed by Parker in the name of petitioner and used to purchase $30,000 in American *252 Express Company checks in his name. On March 31, 1948, petitioner purchased two more money orders, debiting its account; one, in the amount of $2,500, made payable to Color Printing Company, and the other, in the amount of $5,000, made payable to National Direct Mail. Both of these were endorsed by Parker in the name of petitioner and cashed at the Montague State Bank June 22, 1948. They were not received nor cashed by the payees. On April 10, 1948, a bank money order in the amount of $10,000, made payable to petitioner, was purchased by petitioner. This money order was also endorsed by Parker in petitioner's name and cashed on June 22, 1948. Petitioner's account at the Montague State Bank was closed out June 21, 1948. Of the above $30,000 in American Express Company checks purchased by Parker, checks amounting to $8,300 were cashed by Parker. Others totaling $14,700 were cashed by his wife, Edith S. Parker. The remaining checks were made payable to various payees for purposes including the payment of petitioner's litigation fees, hotel bills for Parker and his wife, and costs incurred in publishing the "Liberty Bell", a pamphlet published in Washington, D.C., by petitioner. *253 With the $14,700 in American Express Company checks Edith S. Parker purchased postal money orders. Some of these were used to send money to Parker while he was in jail, $2,311.41 was used to pay the Parkers' rent at the Claridge Hotel, Washington, D.C., $3,500 was issued to Edith S. Parker and $3,500 to Anita P. Bird in amounts of $50 per week each during the period from December 27, 1948, to April 28, 1950. Prior to the issuance of the fraud order by the Post Office Department, petitioner, in an attempt to evade such an order and to continue operation of the puzzle contest, incorporated a new organization on March 17, 1948, called "The Church of the Puritans-The Church of America". Anita P. Bird and Edith S. Parker were named as trustees. On March 16, 1948, Parker entered into an agreement purporting to create a trust known as the Puritan Church Building Fund. On May 29, 1948, Anita P. Bird and Edith S. Parker as trustees of this trust opened a bank account in the name of the Puritan Church Building Fund at the Greenwich Trust Company, Greenwich, Connecticut, and deposited therein $156,500 made up of the two bank money orders in the amounts of $150,000 and $6,495.29, previously *254 referred to, plus $4.71 in cash. In April, 1948, Parker and his wife left Illinois and went to New York. With $10,000 withdrawn from the Montague State Bank, Edith S. Parker opened an account in her own name with the Bank of New York on June 23, 1948. She at all times kept in the check book a check made out to either Harrison Parker or the petitioner in the amount of the account balance in order that the money would be available to Parker in the event anything happened to her. Of the above amount, $4,500 was withdrawn by Edith S. Parker to open an account in her name at the Lincoln National Bank, Washington, D.C., on August 24, 1948. An additional sum of $5,000 was withdrawn by check on September 5, 1949. These latter funds were kept in a safe deposit box at the Lincoln National Bank. Another safe deposit box was rented by Edith S. Parker in a bank in Los Angeles, California, on April 27, 1948, in which she kept some of the American Express Company checks. In August, 1948, the Parkers moved to Washington, D.C. In October, 1948, Parker returned to Illinois to serve his contempt of court sentences. At this time Edith S. Parker went to California, coming back to Washington after Parker *255 had served his jail sentences. During this period Edith S. Parker continued paying rent at their Washington address, the Claridge Hotel. An agreement purporting to have been signed by Edith S. Parker and Anita P. Bird, as trustees of petitioner, and Harvey Wiley Corbett, as architect, was entered into March 6, 1948, for the construction of a meeting house "in or near the town of Lexington, Mass." Petitioner, during September, 1948, purchased a parcel of real estate in Washington, D.C. No land was purchased in La Grange, Illinois. Petitioner was not organized and operated exclusively for religious purposes. Petitioner did not file an income tax return for the taxable years involved nor did it file an exemption affidavit as required by Regulations 111, section 29.101-2, until April 18, 1950. It did not seek nor receive advice from tax counsel as to whether it, in fact, was an exempt organization. Petitioner's net taxable income for the taxable years here involved was as determined by respondent, minus the items included by respondent which we have found did not constitute income. Petitioner was insolvent on May 13, 1948, when it transferred $156,495.29 to the Puritan Church *256 Building Fund. The Puritan Church Building Fund is liable as transferee for the payment of deficiencies and penalties due from petitioner. Petitioner's failure to file income tax returns for the years here involved was due to willful neglect and not due to reasonable cause. Petitioner kept no books nor adequate records. Some of the proceeds received by petitioner from the sale of literature and from the entry fees for contestants in the puzzle contest inured to the benefit of the individuals involved. All or some part of the deficiency of each year was due to fraud with the intent to evade tax. Opinion Respondent, under the provisions of section 146 (a) of the Code, has terminated the taxable year 1948 as of June 30, 1948, and has assessed income tax liability against the Puritan Church Building Fund as transferee of petitioner in the amount of $136,455.72 for the taxable period January 1, 1948, to June 30, 1948. The determination of such original assessment does not constitute a deficiency within the meaning of the Code and this Court is without jurisdiction to determine whether this liability was properly asserted. Ludwig Littauer & Co., Inc., 37 B.T.A. 840. *257 The initial question for our determination is whether or not petitioner is exempt as a religious organization from the payment of income tax within the provisions of section 101 (6) [1] of the Internal Revenue Code. Within this section are established the tests which petitioner, in claiming such exemption, must meet. First, it must be organized exclusively for religious purposes. Second, it must be operated exclusively for religious purposes. Third, no part of its net earnings must inure to the benefit of any private shareholder or individual. Fourth, no substantial part of its activities shall consist of carrying on propaganda or otherwise attempting to influence legislation. *258 After consideration of the record and evidence before us, we are convinced that petitioner has failed to meet the requirements for exemption as provided by section 101 (6). On the theory that the exemption from tax of the income of religious and charitable organizations is for the public good, some decisions have stated that the exemption should be liberally construed. However, for a corporation to qualify for the benefit of such liberal construction it must first bring itself within the reasons for the policy by showing that it was "organized and operated exclusively" for the exempt purpose. Universal Oil Products Co. v. Campbell (C.A. 7, 1950), 181 Fed. (2d) 451; certiorari denied, 340 U.S. 850. The determination of whether petitioner was "organized and operated exclusively" for religious purposes requires an examination of the purpose of its formation, as well as its activities and functions. Unity School of Christianity, 4 B.T.A. 61. The purpose for which an organization is formed is determinable from extrinsic evidence as well as from the charter. Roche's Beach, Inc. v. Commissioner (C.A. 2), 96 Fed. (2d) 776; Sun-Herald Corporation v. Duggan (C.A. 2), 160 Fed. (2d) 475. *259 We believe petitioner was formed in part for the purpose of achieving Parker's personal objectives and not exclusively for religious purposes. Petitioner was organized as a result of a merger of three of the organizations previously formed by Parker. The objective of these organizations, as pointed out in the various letters written by Parker, was the furtherance of Parker's personal feud with the Chicago Tribune and certain public officials. This pattern of activity as shown by letters and publications of petitioner has been continued by petitioner during the years here involved and constituted a primary factor in its formation. That petitioner was formed to accomplish Parker's personal objectives is further emphasized upon examination of the organizational framework of petitioner and the functions performed by its officers and trustees. Petitioner has as its "Chancellor", Harrison Parker; as its trustees, Edith S. Parker and Anita P. Bird, wife and sister, respectively, of Harrison Parker, who shall, according to its by-laws, manage its affairs and establish the rules by which its officers are governed. Edith S. Parker was elected trustee in August, 1947. Contrary to the duties *260 required by this position, her testimony, which was vague and contradictory, showed an unfamiliarity and unawareness of the operations and affairs of petitioner. In some instances she testified she left Los Angeles to come to Chicago in 1946, while at other times she testified she came to Chicago in April, 1948. She was unfamiliar with more than two of the lessons distributed by petitioner, while she also states that she edited some of them. This she did in California as well as after she arrived "in the East", although they were all copyrighted in 1946 and 1947. These inconsistencies can mean to us only, that if she performed any functions for petitioner they were in a titular capacity and not of the directing nature specified in the by-laws of petitioner. Anita P. Bird, Parker's sister, who was the other trustee, and lived in Connecticut the entire time, but made frequent trips to La Grange, testified in a similarly vague and evasive manner as regards petitioner's activities and especially the activities of Parker. Petitioner's activities were described with sweeping generalities which displayed an unfamiliarity with detail, direction and purpose. Her testimony, we believe, can *261 not be accepted in affirming or establishing the purpose for which petitioner was organized. The remaining officer, by whom petitioner was formed and directed, is Parker. He formed the prior organizations which were merged to form petitioner. The lessons and other publications distributed by petitioner on a "donation" basis were written by Parker. The replies to inquiries concerning petitioner's objectives and purposes were composed by Parker. The banking and financial management was conducted by Parker. From the entire record and evidence before us we can only conclude that petitioner was formed and directed almost wholly by Parker and having thus been organized was used by Parker to accomplish his objectives, which we believe to have been a furtherance of his personal feud with the Chicago Tribune as well as the distribution and sale for financial gain of the various pamphlets written by him. The record is replete with inconsistencies, contradictions and uncorroborated self-serving statements which we can not accept as evidence of the purpose of petitioner's organization or activities. The two original trustees, Scott Baldwin and Robert Perry Shepard, were not available for testimony *262 at the hearing. Although Baldwin was supposed to have had office space adjacent to Agnes Richardson, she testified she had "never met Mr. Baldwin or heard of him". She had met Shepard once when she visited Parker in the Cook County jail. Parker testified that during the period from the "early 1930's until the early 1940's" he spent his entire time attending a school conducted by Shepard at his home and it was during this period that he wrote the pamphlets distributed by petitioner. In contradiction of this testimony is the evidence of Parker serving a jail sentence as well as carrying on litigation with the Chicago Tribune and others, which extended throughout most of this period. It is beyond credulity that an effort of this magnitude was a mere pastime as testified by Parker. Also, in a deposition taken from Parker in the case of Harrison Parker v. Jacob Shamberg, Parker insisted that his occupation as well as his avocation was fighting with the Chicago Tribune over a period of more than ten years beginning in 1933. No useful purpose would be served by a continued narration of the evidence before us. It is clear that we can give little weight to the testimony of Parker. Other *263 evidence consists largely of documents and letters written by Parker for petitioner which are, in the main, uncorroborated and self-serving and lend little weight to the contention that petitioner was organized and operated exclusively for a religious purpose. Among the activities engaged in by petitioner was the publication of pamphlets which included a series of twelve lessons, the price of which was $2 for each lesson, or $19.75 for the series. These were distributed to subscribers in a correspondence course manner of one lesson each month. Petitioner also had a plan to distribute free Bibles to inmates of penal institutions. These, however, were accompanied by a request for a donation. These objectives, while laudable, still do not establish that petitioner was organized and operated for an exclusively religious purpose within the meaning of the Code, in view of the purposes and activities of petitioner discussed above. We can only conclude from the evidence before us that petitioner does not comply with the first two tests set out in section 101 (6) of the Code, and such being the case we believe it unnecessary to consider the remaining requirements, Universal Oil Products Co. v. Campbell, supra, *264 nor need we consider the effect of petitioner's failure to file the exemption affidavit required by Regulations 111, section 29.101-2. Petitioner asserts that its attacks on public officials, which included proposed impeachment proceedings, were merely incidental activities and nothing more than the performance of a civic duty. It is difficult to see, however, wherein the public would benefit from a bitter personal attack such as carried on by petitioner for Parker. It concerned itself largely with only those individuals who had dealt adversely with Parker and gained his enmity. No concern for the public in general is exhibited. Petitioner has cited Kotohira Jinsha v. McGrath, 90 Fed. Supp. 892; United States v. Ballard, 322 U.S. 78; Cantwell v. Connecticut, 310 U.S. 296, and other cases, holding in effect that it is beyond the authority of a governmental official to question a particular religious belief or ideology and put an individual to its proof. This contention is not at issue here and is immaterial. Having thus concluded that petitioner, during the years here involved, is not an organization exempt from the payment of income tax, *265 our next issue for consideration is whether the amounts received by petitioner during these periods constitute taxable income within the meaning of the Internal Revenue Code. Income was received by petitioner from various sources: sale of pamphlets; amounts received by petitioner denominated "tithes", "donations", or "contributions"; and fees paid to participate in the puzzle contest. As regards the distribution of the pamphlets, the elements of a normal sale of a product exist and the proceeds resulting therefrom constitute income within the meaning of section 22 (a) of the Code. Subscriptions were solicited by advertisements distributed through the mails. A sales price was established and payment was requested with each subscription. It is immaterial that the price paid was called a "donation". In reality it was the purchase price. The fact that some pamphlets were distributed free of charge or for an amount less than the advertised price does not make this method of distribution something other than a sale. These are commonly used advertising and selling techniques employed in the magazine circulation business. Other amounts received by petitioner were denominated as "tithes", *266 "donations" and "contributions". The use of these terms is peculiar to organizations of a religious title and in a broad sense they refer to payment of money to the organizations. In relation to petitioner, whether we say the payment of these sums constituted remuneration for services performed or an advance for the performance of future services, we are of the opinion that they, in substance, are payment for services and constitute income within the meaning of the Code. It is impossible from the evidence before us to consider specifically the source and manner of receipt of the separate sums of money deposited in petitioner's bank account. However, it is contended that sums of money paid petitioner by Anita P. Bird, Edith S. Parker and C. C. Waterbury, in the alleged amounts of approximately $53,000, $12,250 and $40,000, respectively, were loans made to petitioner. It would appear to us upon consideration of the close relationship of these individuals, the apparent nature of petitioner's financial projects, the financial gain realized and the record as a whole, that these sums, if paid petitioner by these individuals, are of a different character and distinguishable from the smaller *267 contributions paid by individuals not closely allied with Parker and petitioner. These sums which are considered individually below, if paid, we believe, may either constitute capital contributions or advances in the nature of loans. In either case, if they were received by petitioner, they would not constitute income to petitioner within the meaning of section 22 (a) of the Code. Edith S. Parker, it is asserted, loaned $12,250 to petitioner. Parker testified that the amount was $20,500. The testimony of Edith S. Parker, however, was that during the years 1934 to 1943, she paid $7,000 to Parker for the "Puritan Movement." This was prior to the formation and incorporation of petitioner and merits no consideration here. She testified also that in 1947 an additional amount of $5,250 was loaned to petitioner and that notes were received. However, the notes were not placed in evidence, the reason given being that they had been returned to petitioner because they had been paid. Although she was a trustee, she had no knowledge of their whereabouts. Petitioner maintained no books showing accounts payable or notes payable. We have no credible evidence before us showing that petitioner received *268 this amount and are therefore unable to hold that such was the case and that petitioner's income as computed from its bank deposits should be decreased in this amount. As to the amounts paid by Anita P. Bird and her husband, Viggo E. Bird, the evidence is vague and contradictory. In a Post Office Department interrogation Anita P. Bird testified that "any money given was not loaned, it was a contribution." In her testimony in the instant case she, at times, referred to them as contributions. Her testimony is vague as to when the amounts were paid. Parker, in his testimony before the Post Office Department, stated that except for $16,000 these amounts were contributions and not a loan. Also in a letter to V. V. Sugg, inspector for the Post Office Department, Parker stated that Anita P. Bird had pledged $50,000 and actually paid $53,000. Although the amount of the payments by Anita P. Bird is asserted to be approximately $53,000, the evidence before us in the form of cancelled checks verifies payments only in the amount of $37,948.53. Further, it was testified that "notes" were given by petitioner for these payments. These notes were not presented in evidence at the hearing, the reason *269 given being that they had been returned to the Chancellor for renewal. Although Anita P. Bird was a trustee, she had no knowledge of the whereabouts of the notes, nor did Parker. Upon consideration of the evidence as a whole, we believe these payments were made primarily to furnish petitioner working capital with which the various projects could be financed and do not constitute income. Whether the amounts were paid by the Birds with the expectation of financial gain in the form of profits or dividends, or whether they were paid as a loan, is immaterial in a consideration of whether or not they constitute income to petitioner. The evidence before us will only substantiate advances to petitioner by the Birds in the years 1945, 1946 and 1947 in the amounts of $4,500, $27,948.53 and $5,500, respectively, and we so hold. These amounts were improperly included in the computation of petitioner's income. Petitioner asserts that it received from C. C. Waterbury during 1947 loans aggregating $40,000 with which to finance the puzzle contest. In support of this contention we have only Parker's self-serving testimony. No notes were issued and no accounts maintained. Waterbury did not testify. *270 Parker testified that $10,000 was received from Waterbury in March or April, 1947. Petitioner's bank account, however, shows no deposit of this amount during this period. Parker also testified that upon signing an agreement on August 8, 1947, with J. L. Stewart Agency concerning the puzzle contest, wherein petitioner agreed to advance to the J. L. Stewart Agency $40,000, he, Parker, "promptly raised the money." This consisted of an additional loan of $30,000 from Waterbury which, together with the previous $10,000, made up the $40,000 advance and was deposited with Stewart. In a letter to V. V. Sugg, inspector for the Post Office Department, however, Parker listed payments from Waterbury in the following amounts: August 11, 1947
$ 5,000
August 8, 1947
10,000
August 28, 1947
5,000
October 16, 1947
20,000
The only documentary evidence relative to this alleged loan is a Farmers State Bank money order dated December 29, 1947, in the amount of $5,000 made payable to petitioner, endorsed "Pay to C. C. Waterbury Puritan Church by Harrison Parker Chancellor" and a further endorsement in different handwriting, "C. C. Waterbury." Parker testified that this was in repayment *271 of the loan. For whatever purpose this money was paid, we can not, in view of the self-serving and contradictory nature of Parker's testimony, hold that such payment establishes the existence of a loan. With the discrepancies and inadequacies of this proof of the existence of the alleged loan we have no alternative but to hold that petitioner has failed in its burden of proof. Another source of income to petitioner was the payment of entry fees by the various individuals in order to participate in the puzzle contest. It is not possible to appraise the intention of each individual who paid entry fees. We believe, however, from the manner in which the contest was conducted, it was only the intention of the entrants in paying the fee that they be permitted to engage in the contest and gain the opportunity to win the prize. It was not a voluntary payment in the sense that the entrant could participate whether a fee was paid or not. A rule of the contest specified the various amounts to be paid. No prize was allotted for entries which were not accompanied by the payment of a fee. It resolved itself into a situation where, if an individual wished to participate, it was incumbent upon *272 him to pay the entry fee and it was for this purpose, we believe, that the various amounts were paid to petitioner. The fact that the entry blank called the entry fee a "donation" is immaterial. The contest was operated by petitioner for financial gain and, as to petitioner, constitutes income within the meaning of section 22 (a) of the Code. Respondent has computed petitioner's income by means of the bank deposit method in view of the lack of books and records. An examination of the miscellaneous papers which have been placed in evidence conclusively shows that no particular method of accounting was regularly employed which would clearly reflect income. The papers are uncorrelated and, in the main, self-serving and are not books or records of original entry. We are unimpressed by petitioner's explanation that some of the books were impounded in another action. There is a significant lack of effort on the part of petitioner to clear the chaos existing in the record. As we said at the hearing, it is not incumbent upon this Court to audit the books. Ample opportunity was afforded petitioner to provide an acceptable audit or record, but none has been forthcoming. Petitioner asserts *273 that its burden is merely to prove respondent's determination to be arbitrary and invalid and not to prove the correct amount, citing Helvering v. Taylor, 293 U.S. 507; Federal National Bank of Shawnee, Okla. v. Commissioner, 180 Fed. (2d) 494; Hague Estate v. Commissioner (C.A. 2, 1943), 132 Fed. (2d) 775; certiorari denied, 318 U.S. 787. Petitioner's burden, however, is not met by deluging the Court with miscellaneous unsubstantiated papers such as here presented. The evidence of petitioner has been carefully considered and we can only conclude that except for the contributions made by the Birds, discussed above, it fails to show respondent's determination to be erroneous Res.pondent concedes that for the year 1947 petitioner's income as determined from its bank deposits and as set forth in the deficiency notice is overstated in the amount of $29,990. It is petitioner's contention that respondent's determination is excessive in that no allowance has been made for expenses. Here, again, the determination of respondent carries a presumption of correctness and the petitioner has the burden of proving it incorrect. Welch v. Helvering, 290 U.S. 111. *274 Petitioner maintained no accounts payable and certainly no weight can be given to self-serving documents in the form of typewritten papers not made in the course of business. The burden is not met by the mere dumping upon the Court of unexplained and unsubstantiated checks, invoices and vouchers. Their mere presence in evidence does not establish that they were paid and much less, that if paid, the expenditure was for a deductible purpose. Uncorroborated testimony by petitioner that certain expenditures were made "for the Puritan Church" or "in defense of the Puritans" is insufficient to overcome respondent's determination. P. S. Thorsen & Co., Inc., 15 B.T.A. 1281. On the record before us and in the absence of books or acceptable records we have no alternative but to hold that respondent's determination is correct. Hague Estate v. Commissioner, supra. Respondent, within the provisions of section 291 (a) of the Code, has asserted a 25 per cent penalty against petitioner for each of the years 1945, 1946 and 1947 for the failure to file a return. Respondent contends, on the authority of Scranton, Lackawanna Trust Co., Trustee, 29 B.T.A. 698; *275 aff'd., 80 Fed. (2d) 519; certiorari denied, 297 U.S. 723; followed in Estate of Austin C. Brant, 44 B.T.A. 1306, 1315, that since no returns had ever been filed, the imposition of the 25 per cent penalty was mandatory and that it is immaterial whether the failure was due to reasonable cause. Petitioner does not take serious issue with this contention other than to argue that an exemption affidavit was not filed because it considered itself exempt under section 101 (6), and further that from correspondence with the collector's office it was led to believe it was exempt. From a reading of these letters, however, we believe they consist of nothing more than a request for forms to be filed under the Federal Insurance Contributions Act. There is nothing in the correspondence which could be construed as granting petitioner exemption from the payment of income tax or as relieving petitioner of the responsibility of filing an affidavit or a return. Even if we do not rely upon the authority cited by respondent, we still believe petitioner's failure to file a return was not due to reasonable cause. Petitioner's activities were managed by Parker, who *276 is not unintelligent and who has been tax conscious for years. The mere fact that petitioner considered itself exempt is insufficient to constitute "reasonable cause" in view of the fact that it is not shown that petitioner made "a timely effort to get advice or to secure a ruling." West Side Tennnis Club v. Commissioner (C.A. 2, 1940), 111 Fed. (2d) 6. We can only hold, therefore, that the penalties were properly imposed. The Puritan Church Building Fund, it is contended by respondent, is a transferee of petitioner and that the funds possessed by it are those of petitioner and subject to the payment of petitioner's tax. On the other hand, petitioner argues that funds contributed for the specific purpose of building and equipping a Puritan meeting house, or raised by means of the puzzle contest were "impressed with a trust" and could be used only for that purpose and are not subject to the payment of petitioner's debts, citing King v. Richardson, 136 Fed. (2d) 849; In re Rowell's Estate, 248 Wis. 520; 22 N.W. (2d) 604; Chase v. Dickey, 212 Mass. 555; 99 N.E. 410; In re Distribution of Funds of Y.M.C.A. War Fund, 63 Ohio App. 213; *277 25 N.E. (2d) 956; Crane v. Disabled Veterans of the World War, 66 Ohio App. 259; 31 N.E. (2d) 116. These cases deal with a determination of the disposition of the proceeds of an established trust. The question of whether or not a trust was created was not in issue and they are therefore not controlling here. We will deal first with petitioner's contention. It is well settled that to establish the existence of a trust there must be found, by clear and convincing evidence, an intention to create a trust. In this consideration, we believe greater weight should be given to the intentions of the individuals making the payments than those of petitioner. In this case the individuals who would be considered the "settlors," if a trust was created, are of two groups: the contestants in the puzzle contest and those who made donations unrelated to the puzzle contest. As to the first group, we can find nothing in the record evidencing an intent to create a trust. We have already held above that any amounts paid by the contestants were paid for the purpose of participating in the contest with no direction as to the use of the money. This, in our view, is *278 insufficient to establish that a trust was intended. The evidence before us relative to the second group consists of what purports to be copies of letters written by petitioner acknowledging donations to the Puritan Church Building Fund and two letters from individuals to petitioner. One of these referred to an enclosure of $25 to be applied to the puzzle contest and the payment of "tithing" "to aid a little with your church." The other stated that "I am sending 13 dollars extra for the Building Fund. I think it is for a good cause and this is my way of showing it. I hope they will be of some use." These letters indicate only that a donation was being sent. The precatory words used do not evidence the intention to create a trust. Moreover, it is our view that it was not petitioner's intention to build a "Puritan Meeting House." Even if we could conclude from the various statements made by petitioner, which are self-serving, that it did have the intention to build, they are not substantiated by the evidence before us. We can give little weight to the correspondence between petitioner and J. L. Stewart at the time of the origin of the puzzle contest because of the apparent close *279 association there existing and the financial interest of Stewart. In several instances in the record there was testimony that the building was to be erected in La Grange, Illinois. In other instances it was testified that buildings were to be constructed in each of the Federal Reserve Districts. While the contract purportedly entered into with Harvey Wiley Corbett, as architect, on March 6, 1948, specified that "the Owner intends to erect a Meeting House * * * in or near the town of Lexington, Mass.," yet it was not until in September, 1948, that a parcel of real estate was purchased in Washington, D.C.
Relative to the construction of a meeting house in La Grange, Parker testified before this Court that real estate was not plentiful, that it was a seller's market and that it would have cost $60,000 for a plot half the size of that obtained in Washington for $35,000. In testimony before the Post Office Department, however, he testified: "Question: And you do not know what kind or character or location that property may be? "Answer: Yes, we do, land is plentiful. The most difficult thing about a building is the design." We also have serious doubt as to the authenticity of the *280 correspondence purported to have been received from Harvey Wiley Corbett who did not testify. The letters are on paper having no letterhead or other identification and are unsigned. This, as well, reflects on the authenticity of the contract referred to above, which was testified to only by Parker. A "Special Account" was established at the Montague State Bank on December 10, 1947, which on December 13, 1947, contained a balance of $6,495.29 which Parker testified was prize money. No further deposit was made until February 26, 1948, when a transfer of $150,000 was made to this account from petitioner's general account. On March 16, 1948, Parker entered into an agreement purporting to establish a trust entitled the "Puritan Church Building Fund." However, these facts, when considered in relation to the record as a whole, contribute little substance to the contention that the amounts constituted trust funds. The puzzle contests began in September, 1947. There was no separation of funds until February 26, 1948, when the general account had arrived at a balance of $176,279.97. The post office began its investigation in December, 1947. On March 14, 1948, petitioner began withdrawing *281 funds from its account at the Montague State Bank in anticipation of the issuance of a fraud order by the Post Office Department, which was issued April 4, 1948. Petitioner began withdrawing funds from the "Special Account" by means of money orders dated April 10, 1948, made payable to Anita P. Bird and Edith S. Parker as trustees of petitioner, not as trustees of the Puritan Church Building Fund. The appointment of Anita P. Bird and Edith S. Parker as trustees of the Puritan Church Building Fund indicates an intention not to entirely divest itself of the funds in favor of a trust. We can only conclude from this analysis that it was not the intention of petitioner to build nor were the amounts received by petitioner regarded as funds "impressed with a trust." In asserting transferee liability against the Puritan Church Building Fund, the burden of proof is on respondent. See section 1119, Internal Revenue Code. One of the essential elements of this burden is to show that the transfer was either made while the transferor was insolvent, or that as a result of the transfer the transferor was made insolvent. See Kinnett-Odom Co., 19 B.T.A. 1124; *282 Commissioner v. Keller (C.A. 7), 59 Fed. (2d) 499; affirming 21 B.T.A. 84. Respondent has shown that the transfer of funds from petitioner's account to the Puritan Church Building Fund was accomplished on May 13, 1948, when money orders made payable to Anita P. Bird and Edith S. Parker as trustees of petitioner were exchanged for money orders made payable to Anita P. Bird and Edith S. Parker as trustees of the Puritan Church Building Fund, which were deposited to the account of the Building Fund in the Greenwich Trust Company June 7, 1948. On this date, May 13, 1948, petitioner was left with assets consisting of only $254.81 in its bank account and some office furniture, while at the same time debts consisting of deficiencies in income tax and penalties alone, amounting to well in excess of $90,000 for the years 1945, 1946 and 1947, were due and owing, notwithstanding petitioner was ignorant of their existence. Commissioner v. Keller, supra. Even assuming, arguendo, that the sums withdrawn by Parker which were used to purchase American Express checks and funds in the bank account at the Bank of New York in the amount of $10,000 in the name *283 of Edith S. Parker could be considered assets of petitioner, it would still be insolvent and unable to pay its debts. Due to the lack of books or adequate records it is impossible to determine the extent of other assets possessed by petitioner and, as well, other debts which may be owed by petitioner. However, by the above showing, we believe respondent has met his burden of proving that the Puritan Church Building Fund is a transferee of petitioner. We therefore hold that the Building Fund is liable in the amount not exceeding $156,495.29 for the payment of taxes and penalties due from petitioner. It is fundamental that prior to the assertion of liability against a transferee, respondent must exhaust his remedies against the transferor, but where as here such procedure would be futile, respondent properly asserted the liability against the Building Fund as transferee of petitioner. Fairless v. Commissioner (C.A. 6, 1933), 67 Fed. (2d) 475. As to the fraud penalties, respondent has the burden of proof. As said in M. Rea Gano, 19 B.T.A. 518: "To establish fraud by direct proof of intention is seldom possible. Usually it must be gleaned from the several *284 transactions in question and the conduct of the taxpayer relative thereto. * * *" We believe from the record before us that all or some part of the deficiencies for the years here involved was due to fraud with the intent to evade tax. The failure to keep books or adequate records, maintaining multiple bank accounts in other states and the unexplained deposits and withdrawals, the conduct of financial affairs by means of currency exchange money orders, the constant exchange of funds from money orders to bank accounts, then to bank money orders and from there to American Express money orders, and then to postal money orders, as well as the maintenance of safe deposit boxes in different parts of the country - all of these factors together with the failure to file returns unmistakably point to fraud. We are unimpressed by the many unsubstantiated statements appearing in the record in explanation of the various financial manipulations engaged in: the loans, repayments and contributions. As we also said in M. Rea Gano, supra: "A failure to report for taxation income unquestionably received, such action being predicated on a patently lame and untenable excuse, would seem *285 to permit of no difference of opinion. It evidences a fraudulent purpose." We hold that petitioner is liable for fraud penalties of 50 per cent of the deficiencies as herein determined for 1945, 1946 and 1947. Decisions will be entered under Rule 50. Footnotes
1. SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS. The following organizations shall be exempt from taxation under this chapter - * * *
(6) Corporations, * * * organized and operated exclusively for religious, charitable, scientific * * * purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation.↩